**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

FILED

NOV – 8 2019

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

UNITED STATES OF AMERICA,

        Plaintiff,

v.

    CRIM. ACTION NO.: 5:19CR31
    (STAMP)

JAMES JOSEPH MICHAELS,

        Defendant.

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT DEFENDANT'S MOTIONS [19] [20] TO SUPPRESS BE DENIED

    Currently pending before the Court is Defendant's Motion [19] to Suppress Statements, filed October 17, 2019. Also pending is Defendant's Motion [20] to Suppress Evidence, filed October 17, 2019. Plaintiff filed a Response in Opposition [23] on October 29, 2019. The Court held evidentiary hearings on October 31, 2019 and November 5, 2019. After considering the parties' briefs, the applicable law and the Court file, and after considering the evidence and argument presented during the aforementioned hearings, the undersigned would **RECOMMEND** that Defendant's Motions to Suppress [ECF Nos. 19 and 20] be **DENIED**.

## I.
## FACTUAL/PROCEDURAL HISTORY

    On August 6, 2019, Defendant was charged in a one-count Indictment with Unlawful Possession of a Firearm, in violation of 18 U.S.C. 922(g)(1) and 924(a)(2). A forfeiture allegation is contained within the Indictment.

    The aforementioned charge is the result of a search conducted by postal inspectors of Defendant's residence on or about March 12, 2019, which located, among other things, the firearm which is the subject

of the Indictment. Defendant seeks to suppress all items found during the search, as well as all statements he made on the day in question.

The Court held hearings on October 31, 2019, and November 5, 2019 with respect to Defendant's Motions. Because this matter involves two very factually different versions of events, the undersigned believes it is necessary and appropriate to provide an account of each witness's testimony elicited during the two separate hearings. Said testimony is provided below.

### A. Testimony of Lindsay Weckerly – Postal Inspector (10/31/19)

Inspector Weckerly (hereinafter "Weckerly") is a postal inspector with the narcotics team out of Pittsburgh, PA. Her team investigates crimes involving the mail that include narcotics or money laundering. On March 12, 2019, Weckerly was on duty at the Warrendale, PA postal facility. During her shift, she came into contact with what she characterized as a suspicious package. The subject package was addressed to 104 Kuroki Street, Wellsburg, WV, and came from what Weckerly called a "source state" – California. The package was addressed to "Jim;" no last name. Postal inspectors decided to conduct a "knock-and-talk" with regard to this parcel. A "knock-and-talk" is an event wherein members of law enforcement present to a residence to speak to individuals who live there. Postal Inspectors Brandon Holestine (hereinafter "Holestine") and James Pierce (hereinafter "Pierce") accompanied Weckerly to 104 Kuroki Street, Wellsburg, WV.

Inspectors Weckerly, Holestine, and Pierce arrived at Defendant's residence in the early afternoon of March 12, 2019. When they arrived, they saw a female, later identified as Tiffani Kriebel, seated on the front steps of the house. They approached and identified themselves, explaining that they wanted to speak to someone about the suspicious package. The inspectors were not in uniform and their weapons were concealed. Ms. Kriebel did not go inside the house upon their approach; she did not scream; she was not resistant or belligerent in any way. The interaction was a calm one. Ms. Kriebel advised that she did not know anything about the package the inspectors were carrying. The inspectors did not make any accusations toward Ms. Kriebel.

2

Ms. Kriebel further disclaimed knowledge of a "Jim," the person to whom the package was addressed. The inspectors asked for her consent to open the package to determine whether there were hazardous or other non-mailable items inside. Ms. Kriebel gave her consent. The inspectors opened the package and noted inside an opened bag of dog treats with suspected black tar heroin and methamphetamine inside. Ms. Kriebel continued to deny knowledge as to the contents of the package. Upon inquiry, Ms. Kriebel admitted to having used methamphetamine previously, but denied using any in the past ten (10) years.

Ms. Kriebel stated that the inspectors were welcome to come into her house to determine whether there were drugs inside. The inspectors requested and received her permission to enter the home and search.

Inspectors followed Ms. Kriebel into the house. Once inside, Ms. Kriebel began speaking to another individual. According to Weckerly, Ms. Kriebel had previously told them that she was the only one in the residence, and that she lived by herself. As a result, Weckerly asked who Ms. Kriebel was speaking to. Ms. Kriebel advised that she was speaking to her boyfriend, "Chris." Ms. Kriebel further advised that he had been napping inside the house. The person Weckerly believed to be "Chris" then walked out of the back bedroom. Weckerly introduced herself and asked "Chris" what his last name was. "Chris" corrected Weckerly and told her that his name was Jim.

Postal inspectors asked Jim if they could speak to him and he said yes. He denied having any knowledge about the parcel addressed to "Jim." They explained why they were there, that they had opened the parcel and had determined that suspected narcotics were inside. Before reading Defendant his *Miranda* rights, Weckerly explained that his best option would be to cooperate. Weckerly then read Defendant his *Miranda* rights. Defendant acknowledged that he understood his rights and agreed to speak with investigators. Inspectors then asked Defendant for his full name, date of birth and social security number, all of which Defendant provided. Defendant was compliant and remained cooperative. He was not upset.

Defendant was not threatened with arrest if he did not cooperate. Weckerly spoke to Defendant in the living room of the home. Defendant was not handcuffed during this encounter nor was he isolated or restrained. There was no altercation.

Weckerly and Defendant were seated on the couch during the exchange. After reading Defendant his *Miranda* rights, inspectors asked Defendant about the parcel, in particular where it had come from. Defendant admitted that he knew there was heroin in the parcel, which he believed to be about half a gram. He also admitted to having received three prior parcels, all of which contained heroin as well. Defendant informed inspectors where he had gotten the heroin. Defendant identified the individual in California who had sent it to him. Defendant wanted to know what was in it for him if he gave the individual's name. In response, inspectors advised that, if charges were filed, they would let the Government know that Defendant had been cooperative. At the time of this discussion, they were not sure whether charges would be filed. No promises were made to Defendant.

Defendant advised that he communicated with the person in California through cell phone and Facebook Messenger. As a result, Weckerly believed that Defendant's cell phone contained evidence of Defendant's discussions with California about narcotics. Weckerly asked to search Defendant's cell phone. Defendant signed a consent-to-search form, which was admitted as Government's Exhibit A.

Government's Exhibit A is not the typical form used by postal inspectors but is a form they obtained from local law enforcement. The postal inspectors did not have a consent-to-search form with them on this day. Local law enforcement was contacted because of the narcotics within the parcel. Initially, consent to search the cell phone was obtained and they did not intend to search the residence, so "residence" was struck from the form. When Defendant advised that a firearm was in the drawer within his bedroom, inspectors handwrote "residence" onto the form to search the residence. Defendant initialed both changes on the form.

Defendant also initialed his understanding that any evidence obtained may be used in a criminal prosecution. He acknowledged on the form that he was giving his consent freely and voluntarily.

4

Defendant did not appear to be under the influence of drugs at the time of the consent, nor was he combative. A criminal history check was conducted which revealed that Defendant had prior felony convictions and an active warrant issued from California. Defendant admitted that he knew he was a felon and should not have been in possession of a firearm. Inspectors asked Defendant if he knew of criminal activity in the area, and he denied knowledge of the same. Inspectors then advised that they would speak to prosecutors about the matter and he would be advised if charges would be filed.

During this interaction, Defendant never told inspectors to leave. Inspectors never told Defendant that he could not leave. Defendant was never isolated. Weckerly never drew or showed Defendant her weapon. The conversation on the couch lasted approximately an hour to an hour and a half. Inspectors were present for approximately two hours total. Defendant never revoked his consent to search. Ms. Kriebel never instructed inspectors to leave and never revoked her consent to search. The search resulted in the following: Defendant's cell phone, a firearm and drug paraphernalia.

In the hallway near the bedroom, and prior to the conversation with Defendant, Weckerly and the other inspectors became concerned about officer safety when Ms. Kriebel started speaking to someone in the house because she had previously advised that she lived there alone. When they realized that someone else was in the house, they conducted a cursory search of the rooms to make sure that there were not any other individuals in the house other than the person to whom Ms. Kriebel was speaking.

When they moved to the couch, Weckerly showed Defendant her credentials, but did not discuss her duty weapon, which was concealed under her clothes. She was not wearing anything which would have identified her as being a postal inspector nor was she in tactical gear. She does not recall what her colleagues were wearing. It appeared to her as though Defendant had just woken up.

Her colleagues had their duty weapons with them as well, and they too were concealed. Inspectors searched beneath the couch cushions before Defendant sat down. They told Defendant that he did not have to answer questions and that he was not under arrest. He did not leave the couch for the next hour and a

half.  Defendant could have gotten up and walked around his residence, but he did not and he did not

mention a desire to do so.

Weckerly left the residence to perform a criminal background check.  Pierce was in and out of the

residence during the interview.  At some point, state and local law enforcement arrived, and they were in

and out of the residence, too.  Defendant was told he could stop the interview at any time, and he was not

in custody.  Even though he was not in custody, he was read his *Miranda* rights because inspectors were

being extra cautious.

No written *Miranda* form was executed because inspectors did not have that form with them for

the interview.  There were three consents to search given (one from Ms. Kriebel before they entered the

house, which was a consent to search; one from Defendant to speak with inspectors; and one from

Defendant to search the house).  Only one consent form was obtained.  The form contained Defendant's

consent to search his cell phone and the residence.

After the interview concluded, Defendant was left alone in the house while inspectors discussed

things outside.  He was not handcuffed.

During the interview, inspectors asked Defendant if he was dealing drugs, which Defendant denied.

Weckerly does not recall the phrase "deep shit" being used.  She also does not recall Defendant asking if

he needed an attorney.  Weckerly does not recall who went over the consent-to-search form with Defendant

or the Defendant saying that he could not read the form because he did not have his glasses.  While they

were going over the form, it was explained to Defendant that they could search Defendant's cell phone after

obtaining Defendant's consent, or they could apply for and obtain a search warrant.  Inspectors explained

that the process would take longer to get a search warrant.

Defendant's interview was not recorded nor did she take notes.  Holestine took notes.  Holestine

completed the memorandum of the interview, which would have occurred within one week after the knock-

and-talk.

Postal inspectors do not have body cameras. They do not record every interview. Weckerly has not recorded interviews in the past nor has she been present when other interviewed people have been recorded.

**B. Testimony of James Joseph Michaels – Defendant (10/31/19)**

Defendant is fifty-two (52) years old and lives at 104 Kuroki Street, Wellsburg, WV with his ex-wife, Tiffani Kriebel. He is on disability and has lived at his current address for approximately one- and one-half years. He has completed some college education.

He remembers having contact with law enforcement in the early afternoon of March 12, 2019. His ex-wife was outside, and he was in the bedroom taking a nap. He heard voices outside the bedroom, so he opened the bedroom door. When he opened the door, he saw a female who appeared to be an inspector of some kind, later determined to be Weckerly. She ordered Defendant out of the bedroom. She asked if his name was Chris, and he said no. He identified himself as Jim. Holestine came up next to Weckerly and made Defendant sit on the couch. They searched the couch first before placing Defendant there. Defendant felt scared at this point. He believed he was under arrest. Weckerly was dressed in plain clothes, but she had a weapon and a badge at her side. She was not wearing a jacket. Nothing else about her clothing identified her as a federal agent, but she showed Defendant her identification/credentials and explained that she was a federal agent. Holestine was wearing a badge, a gun and a vest. He also identified himself as a federal agent but did not demonstrate credentials.

Defendant felt as if he had no choice but to comply. One of the inspectors was very aggressive, talking about drugs, accusing Defendant of selling drugs and telling him that he was in "deep shit," and that he had better cooperate. Defendant was upset and did not know what to do. He did his best to follow orders. He sat on the couch and did not move – there were three inspectors surrounding him. Ms. Kriebel was outside at this time. Defendant could hear her outside with other inspectors who had detained her.

Defendant believes Pierce never identified himself.  He was dressed in a tactical vest that said "agent" or something like it.  Defendant saw Pierce's duty weapon.  He followed Holestine into the living room and planted himself against the living room wall and stood over top of Defendant.

Holestine was very angry and very aggressive.  He kept yelling at Defendant, saying that Defendant was in "deep shit" and that Defendant had "better cooperate."  Again, Defendant was "really scared."  Holestine accused Defendant of committing a crime, accused him of "selling shit."  Defendant denied selling drugs, stating that he had never sold them before in his life.  Weckerly was also very aggressive, accusing Defendant of selling drugs.

Neither Inspector told Defendant that he was under arrest; but neither inspector told Defendant that he was not under arrest either.  They did not tell him that he could leave if he asked.  They did not tell him that he did not have to answer questions.  They did not read him his rights.  He never signed a form acknowledging that he was waiving his right to remain silent.  They never told him he could refuse to answer questions.  He did not feel as though he could get up and walk around.  He knew he was not going anywhere.  At some point, he asked to go to the restroom, but he was told no.  He sat on the couch for about an hour and a half.

Defendant was very uncomfortable with how he was being questioned and the fact that he was being yelled at.  He felt like he was being arrested and like he was in trouble, so he said he thought he needed a lawyer.  The questioning inspector yelled at Defendant and said something to the effect of, "What do you think you need a lawyer for?  You're not under arrest."  Defendant was very uncomfortable talking to them but did not believe he had a choice.  He did not know what kind of trouble he was in because it was never explained to him.

Defendant only ever saw the three (3) postal inspectors in the residence.  He never personally saw any state or local authorities in the residence.

Defendant did not pursue his request for an attorney because, essentially, Inspectors told him he did not need an attorney – they were looking for people who were selling drugs and mailing drugs, and they

did not believe that Defendant fit into either one of those two categories. They then asked about his cell phone, which was in the other room. They said they wanted to look through it and make sure Defendant was not selling drugs. They asked if it was ok for them to search his cell phone. The questioning inspector left to get a form. He went outside and came back a few minutes later. The Inspector put the form in front of Defendant, gave him a pen, and said, in essence, this is a form that gives consent to look through Defendant's cell phone. Defendant tried to read through the form, but the Inspector got really mad and said, "you can either sign the fucking thing or I'm going to get a warrant." The Inspector threatened that he would get a warrant anyway, so Defendant might as well sign the form to make it easier.

Defendant could not read the form because he did not have his glasses. Defendant was told the consent was limited to his cell phone. No one read the form to him. When he told the Inspector that he could not read the form, the Inspector got angry. Defendant signed the form but felt as though he could not refuse to sign it. The Inspector said they would be sitting there a few hours if they had to go get a warrant.

When he signed the form, Inspectors asked for his password which was written down on the consent form. Once he signed the form, Holestine and Weckerly went to the dining room and retrieved Defendant's cell phone. They began looking through it and then stepped outside. Pierce was still standing over Defendant while Defendant was on the couch. Defendant asked Pierce if he could use the restroom at this time. Pierce said "no."

When Holestine returned, he asked Defendant if he wanted to tell them about any drugs or weapons in the house before they had a K9 come in and "tear this place up." Defendant disclosed that his father-in-law left an unloaded revolver in the desk drawer. Additionally, a BB gun was on the headboard of the bed. Holestine walked into the bedroom, retrieved the weapon. He then walked past Defendant (it is unclear from his testimony whether Defendant got up from the couch at some point and followed Holestine into the hallway or bedroom, or whether Holestine passed Defendant as he was still seated on the couch), Holestine said "You know you're fucked, you're not supposed to have any weapons." Then, according to Defendant, Inspectors placed him in handcuffs and "that was it."

9

Defendant never told the Inspectors to get out of his house. No one physically pushed Defendant onto the couch or physically pulled him anywhere. He was not handcuffed as he walked to the couch. He was not isolated from Ms. Kriebel.

Although Holestine was very aggressive, including telling Defendant he was in "deep shit," Defendant did not stop the questioning and tell Inspectors to leave because this was not a situation, he was familiar with. This was the first time this has ever happened to Defendant. He was scared. Defendant testified that he did not have a problem with inspectors searching through his cell phone.

Defendant admitted that he has a criminal history; that he has been arrested before. Defendant was given his *Miranda* rights before. Defendant acknowledged that he is aware of what *Miranda* rights are and that he can revoke them. He also acknowledged that he has previously been handcuffed during prior arrests. During this encounter, no one told Defendant that he could not leave.

Defendant denies initialing the search of his residence. When he initialed the consent-to-search form, he thought he was consenting to the search of his cell phone only, however, when shown the consent-to-search form, Defendant acknowledges that the initial next to "cell phone" and "residence" are his initials.

### C. Testimony of Tiffani Kriebel – Defense Witness (10/31/19)

Ms. Kriebel lives at 104 Kuroki Street, Wellsburg, WV. She has lived there for approximately a year to a year and a half. Defendant resides there with her. She works at Shop and Save in Weirton, WV. She has some college education. On March 12, 2019, she had contact with law enforcement at her home in the early afternoon hours.

On that day, Ms. Kriebel was in her front yard taking her dog to the restroom. Two inspectors walked up into the middle of the yard, a male and a female. The male was dressed in a white t-shirt, blue jeans and had on a bulletproof vest. She was able to see his duty weapon and his badge. He identified himself as a federal agent. The female inspector was dressed in a white blouse, black slacks and elevated boots. She was not wearing a jacket. There were no other markings on her clothes to indicate that she was law enforcement. She does not recall if the female inspector was wearing a duty weapon. A third inspector

was present.  He was wearing a white t-shirt, blue jeans and a green vest.  He was also wearing his duty weapon.  They identified themselves as federal agents and they were carrying a mail package.  They said drugs were inside the package and the drugs were sent to Ms. Kriebel's address.

Ms. Kriebel disclaimed knowledge of the package and what was inside.  One of the inspectors shoved the package in her face, was aggressive and was swearing at her.  He asked "What the fuck is this?  Why are you having drugs sent to this address?"  Ms. Kriebel again disclaimed knowledge about the package.  A K9 officer stepped into the yard at that time.  His dog was not with him – she identified him by his jumpsuit and his vest.  He had a black and white car.  He was from the Sheriff's Department (it was unclear which Sheriff's Department to which Ms. Kriebel referred).

Inspectors asked Ms. Kriebel who was in the house.  Ms. Kriebel lied and told them "Chris" was in the house.  She lied because she was "taken aback" and "shocked."  She did not know what was going on and they made her nervous.  She was scared.  They never told her she did not have to answer their questions.

Inspectors asked Ms. Kriebel if they could speak with "Chris."  She said "okay," and walked up her stairs.  They followed her into the house.  She did not feel as though she could refuse to answer their questions.  They were aggressive and she was intimidated.  They did not tell her whether she was under arrest.

Once inside the house, she called to "Chris," and told "Chris" to get up.  The inspectors followed her to the small hallway just outside the bedroom door.  She then walked back to the dining room where she was confronted by the shorter inspector.  He got into her face, picked up something from the dining room table (a mascara brush) and said, "This is a push rod…this is a fucking push rod."  She asked what a push rod was.  The inspector said, "You know what the fuck a push rod is."  Then he threw it back down onto the table.

Officer Knisley then arrived at her door.  Officer Knisely is a Brooke County Deputy Sheriff but says she did not know him before this encounter.  She inquired as to whose vehicles were outside the house.

11

At this time, Defendant was with the two other federal inspectors who were leading him to the couch.  They looked under the couch cushions and then he sat down.  They sat next to him.  She did not hear Weckerly speak to Defendant because she was getting the push rod shoved into her face.  Officer Knisley is a K9 Sheriff.  He was in uniform.  He stepped into the house and asked if Ms. Kriebel had any keys to the vehicle outside.  She picked up her keys and went outside.

When she went outside with her keys, she walked down the stairs from her porch and stood in the yard with Inspector Knisley who was questioning Ms. Kriebel about the vehicle "and everything."  She never returned to the house.  "They" would not let her.  She asked to go back inside, but there were two more inspectors on the front porch, and they did not let her inside.  She asked to use the restroom, but she was told no.  She asked if she could have something to drink, and they told her no.  She asked if she could have a cigarette, and they told her no.  No one physically restrained Ms. Kriebel during these events.

When inspectors first arrived at the house, Ms. Kriebel told them that she had taken drugs before, but was now clean.  She "absolutely" offered to prove that she was clean but denies telling them they could go into her house.  She says she "wouldn't tell them to go in [her] house."  She told them Chris was inside the house.  She acknowledges that she gave inspectors permission to enter her house to talk to Chris.

### D.  James Pierce –Postal Inspector (11/5/2019)

Pierce has been with the United States Postal Inspection Service for about two and a half years.  He is assigned to the mail theft, identity theft, and narcotics team.  He was on duty on March 12, 2019, first in Pennsylvania and then in West Virginia.  On that date, he was working on postal interdiction at the Warrendale, PA postal facility.  On that day, a suspicious package was found, and a workup of the parcel was conducted.  Following the workup, Pierce drove a vehicle with two other postal inspectors to West Virginia, to the address on the package to investigate, and conduct a knock-and-talk.  The parcel was suspicious because the return address was not valid and that the person to whom it was addressed "did not come back to the address," i.e. registered at the recipient's address.

12

When they arrived during the daylight hours, inspectors saw a female in front of the residence. They introduced themselves when they got out of car. Pierce was wearing plain clothes; no one had on a uniform, tactical vests, or bullet proof vests. His weapon was on his belt, but it was concealed. They did not draw their weapons; they did not shout as they approached. The female on the front porch, later identified as Ms. Kriebel, did not go inside the house. She did not appear to be upset. Pierce does not recall whether he showed Ms. Kriebel his credentials. He does not recall whether he specifically introduced himself to Ms. Kriebel as a postal inspector, though he testified that he "always" does that.

Pierce was there for officer safety. Holestine conducted primary communication. Holestine did not wave the package in Ms. Kriebel's face. He did not say something along the lines of "what the fuck are you doing getting drugs in the mail?" No one swore at Ms. Kriebel at any time. No one accused her of receiving drugs in the mail or receiving a suspicious package. They did explain why they were there, which was to investigate a suspicious package addressed to her residence. Pierce did not speak to Ms. Kriebel himself. Pierce did not advise Ms. Kriebel that she was under no obligation to answer questions. He does not recall if Holestine so advised her.

When they approached Ms. Kriebel, they did not know that there were drugs in the package because it was sealed. Ms. Kriebel said that the person the package is addressed to did not live there live there; she said she lived alone. Holestine asked if he could open the parcel. Ms. Kriebel gave her consent. Inside the parcel was a closed, unsealed bag of dog treats or dog food. Holestine opened the bag. Suspected narcotics were found in the bag, which Pierce believes were heroin and methamphetamine. Ms. Kriebel appeared to have been surprised. He does not recall specifically if anyone asked Ms. Kriebel if they could search the residence. He does not remember if Ms. Kriebel gave her consent to enter her residence to conduct a search, but he believes they had consent to enter the residence. Inspectors followed Ms. Kriebel inside the residence. Pierce does not know whether either of his colleagues asked Ms. Kriebel to sign a form giving permission to search the residence. He agrees that the only form signed that day was Government's Exhibit A, which was signed by Defendant.

13

Once inside, Pierce believes she began talking loudly to "Chris." They eventually came into contact with a male individual who appeared surprised that Ms. Kriebel was referring to him as "Chris." Defendant walked out of the bedroom – there was no conversation or request that he exit the bedroom. He does not remember either of his colleagues ordering him to come out of the bedroom. Defendant identified himself as "Jim." Postal inspectors wanted to speak with "Jim" because that is the person to whom the package was addressed.

Jim, or Defendant, was cooperative. The other two inspectors asked Defendant if he would be willing to speak to them, and Defendant said yes. Defendant and the other postal inspectors sat on the living room couch. Pierce does not believe that Defendant was directed to the couch. He remembers a calm setting. At some point thereafter, Pierce went outside with Ms. Kriebel.

Defendant was not combative. No one was combative with Defendant and no one physically restrained him. Pierce never told Defendant that he had to stay on the couch to answer questions and Defendant never told them to leave, nor did Ms. Kriebel ever tell inspectors to leave. Pierce never drew his weapon. Neither Pierce nor his colleagues told Defendant that they could leave at any time. They were at the house for a couple of hours.

While Pierce was in the residence, Pierce does not recall whether he or his colleagues ever said to Defendant "you're not under arrest." He does not recall whether he or his colleagues ever said to Defendant "you don't have to answer any questions here." Pierce does not remember whether he or his colleagues ever said to Defendant "if you want to get an attorney, you can have an attorney present." Pierce did not read Defendant his rights. He does not recall hearing either of his colleagues read Defendant his rights. Pierce does not believe he was present when Defendant was read his rights.

During the time that Pierce was inside the residence, Defendant was seated on the couch. Pierce never saw Defendant walk around the house, smoke a cigarette or use the restroom. Pierce does not recall Defendant asking to use the restroom. He does not recall Defendant asking for an attorney.

14

Inspectors asked for and received Defendant's consent to conduct a search of the residence and Pierce never heard Defendant revoke said consent. The consent form (Exhibit A) used is not the standard postal form but was a form from one of the local law enforcement agencies. Pierce obtained this form because postal inspectors did not have the standard postal form with them. The vehicle they were driving that day is assigned to Pierce. He agrees that, if someone is giving up their rights, the better course is to get them to do it in writing.

The consent-to-search form was presented to Defendant. Pierce filled out three items on the form and signed the form. Pierce inserted the handwritten "cell phone" on the search form. He also noted Defendant's cell phone password at the bottom of the form. He does not recall who scratched out the preprinted word "residence" or who reinserted a handwritten "residence" on the form. After they obtained consent to search, drug paraphernalia was found in the home. "Content" was also located on Defendant's cell phone. No one told Defendant that he was in "deep shit." Pierce never heard Defendant ask for a lawyer. He has been in situations where a Defendant has requested a lawyer. In those situations, he explains that he cannot tell them whether they need a lawyer, but if they would like to obtain one, they will stop questioning so that the person can obtain an attorney.

Pierce was present when Defendant signed the consent-to-search form and believes someone else read through the form with him. Once consent to search was obtained, they searched the residence for illegal items. For the majority of the search, Pierce was outside with local law enforcement.

Pierce does not recall Defendant ever indicating that he needed his glasses or help in reading the consent-to-search form. Pierce did not tell Defendant that if he did not give consent to search, they would come back with a warrant and does not recall anyone saying this.

Pierce and Weckerly went into the bedroom to conduct a search once the form was signed and does recall his colleagues asking Defendant whether there were any weapons in the home. He does not remember Defendant telling Holestine that the gun belonged to Defendant's father-in-law.

15

**E.   Brandon Holestine – Postal Inspector (11/5/2019)**

Holestine is assigned to the Cleveland, Ohio postal inspection field office.  He conducts narcotics-related investigations, as well as dangerous mail investigations and investigates violent crimes related to the postal service.  He was on duty on March 12, 2019 and participated in a joint effort with the Pittsburgh, PA field office conducting narcotics interdiction at the Warrendale, PA processing and distribution center. While on duty, he came across several suspicious packages, including the one at issue in this case.  The package was "suspicious" because it came from an invalid California address and because it was addressed to a "Jim" with no last name.  Holestine testified that failure to include a last name is an attempt to conceal the identity of the recipient.  There was no drug dog alert on the package. It was determined that an enforcement action of some type should be undertaken, and it was agreed that a knock-and-talk would be conducted.

A knock-and-talk is a law enforcement activity involving either federal, state or local officials working together to make contact with the recipient of the parcel or the individual who is living at the address to determine the contents of the package and determine whether the person at that address is the intended recipient.  Inspectors Holestine, Weckerly and Pierce conducted the knock-and-talk on the date in question.

As they approached 104 Kuroki Street in Wellsburg, WV, they saw a female sitting on the front steps.  They arrived midafternoon.  They approached the female with the package in hand.  She came down the steps.  She did not appear agitated.  She appeared to be calm and intrigued about why they were there. She did not attempt to run back into the house.  She was not combative.  Holestine was wearing civilian clothes, a polo shirt and jeans.  He did not have a tactical vest on, nor was he wearing a bulletproof vest. His colleagues were wearing plainclothes.  Holestine's weapon was concealed under his shirt.  He might have been wearing his neck badge to identify himself as law enforcement.   No one drew their weapons at any time.  No one was shouting at Ms. Kriebel.  He did not waive the package in Ms. Kriebel's face.  They did not accuse her of receiving the subject package.  They asked her if it was her package – they did not

16

accuse her.  They were trying to determine whether she was involved in the process or whether she was a

resident at the address.  He did not ask her "what the fuck are you doing with drugs in the mail?"  He did

not cuss at her.  He did not know when he approached that there were drugs in the package because the

package was still sealed.

Upon approaching Ms. Kriebel, they asked if she was expecting a package from the postal service.

Inspectors did not advise Ms. Kriebel that she did not have to answer their questions.  They did not advise

Ms. Kriebel that she could stop the questions and inspectors would leave.  She advised that she was not

expecting any packages.  Inspectors advised her that a package was addressed to her physical address from

California and that they suspected it contained contraband.  She reiterated that she was not expecting any

package from California.  Inspectors asked who "Jim" was and she said she did not know a "Jim."  She

further stated that no one lived with her – she lived alone.

Inspectors then asked if they could open the parcel.  Ms. Kriebel consented.  They opened the parcel

in front of her and it contained an unsealed pack of dog treats.  They opened the interior packaging and

located what appeared to be a plastic bag with crystal meth and heroin which was field-tested later at the

Warrendale, PA facility using a TrueNarc device.  They advised Ms. Kriebel of the contents of the package

and asked her if she was involved.  She reiterated that she was not.  Inspectors asked if Ms. Kriebel used

narcotics.  She advised that she had used narcotics approximately ten years prior, but that she was currently

clean.  She said she would be willing to take a drug test.  She also advised inspectors that they were welcome

to search her residence and that they would not find drugs there.  Holestine asked her if they could search

her residence and she said yes.  She proceeded up the steps and inspectors followed her into the residence.

She was about three feet ahead of inspectors at this time.  Inspectors did not obtain a written waiver of Ms.

Kriebel's consent to search the residence.

When Ms. Kriebel was in the residence, she began to call out.  This raised a safety concern for

inspectors because, shortly before entering the house, Ms. Kriebel stated that she lived alone.  Thereafter,

an individual who she identified as "Chris" walked out of the bedroom.  Inspectors did not order "Chris"

out of the bedroom. "Chris" was not combative and not agitated but was curious about why they were there. Ms. Kriebel identified "Chris" as her boyfriend. Weckerly made contact with "Chris" and asked him for his last name. "Chris" corrected Weckerly and told her that his name was "Jim" not "Chris." Weckerly identified herself as law enforcement, postal inspectors. She advised that they would like to speak to him because the package is addressed to "Jim." They asked him to step into the living room to speak to the inspectors. Holestine asked Jim if they could ask him a few questions. At that point, Holestine did not say that Defendant did not have to answer questions. He was not told that he was not under arrest at that time. Defendant walked to the couch on his own. Inspectors followed and sat down with Defendant.

To be cautious, Weckerly read Defendant his *Miranda* rights in Holestine's presence. Weckerly advised Defendant that he could invoke those rights at any time. Defendant acknowledged his rights and he waived them. Defendant said he wanted to speak to inspectors. The conversation took place in the living room of the residence. Inspectors did not obtain a written consent to waive Defendant's *Miranda* rights from Defendant and acknowledged that the better practice would have been to have a consent form with them.

During the conversation, Defendant, Weckerly and Holestine were seated. Holestine was not standing over Defendant. There was no physical altercation. Defendant was not handcuffed, restrained, or under arrest.

Immediately, Defendant stated that Ms. Kriebel had nothing to do with the package. He identified the contents originally as heroin and then admitted to methamphetamine being included as well. Defendant admitted he wanted to use the methamphetamine to get off of heroin. Defendant also admitted to having made other prior purchases from the same individual whom he had known while residing in California. He provided the individual's name. Defendant inquired what he would get out of it if he gave a name. Holestine advised that he could not make any promises but would tell prosecutors that Defendant had been cooperative. At that time, Holestine did not know whether the case would be pursued or by whom it might be pursued.

Defendant also advised inspectors that he communicated with the person in California via cell phone and Facebook. At that point, inspectors wanted to look at the cell phone and obtained a consent form from local law enforcement. Inspectors read the form to Defendant and advised him of his rights and, specifically, that he had the right to revoke permission to search at any point. Defendant never indicated that he needed his glasses and never indicated that he could not read the form. Defendant never asked for assistance in understanding the form.

"My residence" is scratched out on the form because originally, inspectors only wanted to search the cell phone. However, further questioning resulted in their desire to search for other contraband in the house inasmuch as Defendant admitted that drug paraphernalia was in the house. Inspectors also saw something in the bedroom that appeared to be a gun. Defendant advised that the gun inspectors saw was a BB gun. Holestine inquired further about weapons in the house, and Defendant admitted that there was another weapon in the bedroom.

At some point, Defendant's criminal history was obtained and it became known that Defendant was a felon. They asked Defendant about his two prior felony convictions for child cruelty/child endangerment and for carrying concealed weapons. Defendant acknowledged that he was a convicted felon. He also acknowledged that he knew he could not have had a firearm. Holestine believes that Defendant stated he had the firearm for protection.

During this conversation, Defendant never asked if he had to stay. He never told inspectors to leave. He was never isolated in a different room. Holestine never drew his weapon. He estimates that Defendant was questioned for approximately forty-five minutes to one hour on the couch. Defendant never revoked his consent to search. Ms. Kriebel never revoked her consent to search the residence. Holestine never told Defendant that he was in "deep shit". Holestine does not recall Defendant asking for a lawyer. If he had, Holestine would have advised that he cannot provide legal advice and would have stopped the questioning immediately because that would have been an invocation of *Miranda* rights.

19

If someone had to use the restroom during questioning, inspectors would conduct a cursory search of the bathroom to make sure there were no weapons, and then they would allow the person to use the restroom. He has never denied a person the ability to use the restroom in a situation like this.

The conversation with Defendant was not recorded. Recording conversations is not a practice that postal inspectors would commonly ever use. Holestine took notes of the conversation and prepared a written report. Defendant's consent to search the residence and his execution of the document is not captured anywhere in Holestine's report.

Holestine did not expect to conduct a search on this day and did not expect to find a firearm, which is the reason they did not have a *Miranda* form with them.

## II.
## ARGUMENTS OF THE PARTIES

### A. Defendant's Arguments

Defendant contends that all statements should be suppressed because he was in custody at the time of the interrogation but was never given his *Miranda* rights. Defendant further contends that all evidence seized on the day in question should be suppressed because neither Ms. Kriebel nor Defendant gave consent to search their residence.

### B. Government's Arguments

The Government argues that Defendant was not in custody on the date in question, therefore, *Miranda* warnings were not required. Nevertheless, the Government maintains that *Miranda* warnings were given to Defendant.

The Government further argues that Defendant's consent to search both his cell phone and residence was knowingly and voluntarily given. The Government notes that the Defendant's consent was captured in writing. Additionally, the totality of the circumstances surrounding the search of the residence indicates that the consent was voluntarily given and not a mere acquiescence to authority.

# III.
# STANDARDS

The burden of proof for a Motion to Suppress is on the party seeking to suppress the evidence. *United States v. Gualtero*, 62 F.Supp.3d 479, 482 (2014) ("[t]he legal standards governing a motion to suppress are clear....[t]he burden of proof is on the party who seeks to suppress the evidence") (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)). Once the defendant establishes a basis for his Motion, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974)).

With these standards in mind, the undersigned will turn to the substance of the arguments raised vis-à-vis Defendant's Motions to Suppress.

# IV.
# DISCUSSION

## A.   Credibility

Defendant's account of the events in question is diametrically opposed to the account provided by postal inspectors, hence the foregoing detailed summary of witness testimony. Accordingly, in order to meaningfully evaluate the issues raised herein, the undersigned must first determine upon whose testimony the undersigned, and the court, should rely as the most accurate version of events on the date in question.[1]

### 1.  Defendant – James Joseph Michaels

According to Defendant, he exited the bedroom of his house on orders from the postal inspectors, all of whom were crowded in and around the tiny hallway in front of the bedroom door, and who were standing mere feet from the door when he opened it. Upon opening the bedroom door, Defendant claims that he was ordered to the living room, ordered to sit on the couch, and suffered three postal inspectors standing over him in a seemingly intimidating manner while accusing him of having committed a crime and essentially threatening him if he did not cooperate with them and their investigation. Defendant further

---

[1] The undersigned has paraphrased the testimony captured herein.

21

testified that he was not permitted to get up from the couch, including to use the restroom despite having an urgent need to do so. Defendant said that he was scared, upset and that he thought he was under arrest. He testified that he had never been in this position before. Defendant also testified that he was denied his right to an attorney despite asking for one. All indications from Defendant's testimony are that he was threatened, intimidated and coerced into answering inspectors' questions, which resulted in his giving incriminating statements to law enforcement, and which statements lead to his being charged in this case. Defendant's testimony is not entirely consistent, though, and is inconsistent on several important points.

During cross examination, Defendant admitted that he had been arrested before. During this prior arrest, he was handcuffed. This admission contradicts Defendant's assertion during his direct testimony that he was scared because this was the first time that something like this had happened to him. If Defendant was less than truthful about his having been in a similar situation before, then it naturally follows that Defendant could be less than truthful about fear being the primary reason he answered inspectors' questions and signed the consent-to-search form.

Additionally, Defendant admitted that he did not have a problem with inspectors looking through his cellular phone on the date in question. This contradicts Defendant's assertion that he signed the consent-to-search form because he was scared. By extension, such an admission also casts doubt upon Defendant's claim that he did not speak to inspectors voluntarily, but did so only because he was, again, scared. Defendant did not have a problem with inspectors searching through his cell phone, which contained evidence of Defendant's communications with a person in California about obtaining illegal substances. According to the evidence, the only reason inspectors knew about Defendant having communicated with California about drugs via his cell phone (and Facebook) was because he answered questions to this effect. It does not make sense that Defendant would refrain from objecting to inspectors examining his cell phone in order to confirm something that he himself had told them, but nevertheless maintain that he did not voluntarily make such a disclosure. The undersigned is therefore not persuaded by Defendant's testimony that he did not voluntarily consent to speaking with inspectors.

Defendant's admissions also cast doubt on his claim that he did not initial the consent-to-search form and, as well, Defendant's assertions that he did not know what he was authorizing when he signed and initialed the form.  The undersigned would further note that the initials next to the words "cell phone" on the consent-to-search form are nearly if not identical to the initials next to the word "residence."  There is no evidence that anyone other than Defendant initialed the consent-to-search form.

Because the aforementioned contradictions in Defendant's testimony are substantive contradictions that go to the heart of Defendant's version of events, said contradictions call into question the inherent credibility of Defendant's testimony as a whole.  Therefore, the undersigned is not persuaded that Defendant's version of events is the most accurate accounting of what actually transpired.

### 2.  Defense Witness – Tiffani Kriebel

The undersigned similarly believes that Ms. Kriebel's testimony is inherently incredible.  By Ms. Kriebel's own admission, she lied to inspectors about Defendant's name and whether she lived alone. Moreover, she told inspectors that "Chris" was inside the house when she knew that Defendant, "Jim," was the person inside.  Ms. Kriebel claims that she lied about Defendant's name because she did not know what was going on and she was scared, but this explanation does not make sense when considered in conjunction with the balance of her testimony.

Ms. Kriebel testified that, essentially, postal inspectors charged into her yard while she was taking her dog to the bathroom[2] and began cursing and shoving a package in her face in an aggressive manner. According to Ms. Kriebel, they were swearing at her and accusing her of having drugs sent to her home address.  It is unclear why Ms. Kriebel would feel the need to lie about Defendant's real name in this situation or that she lived at the residence alone.  There is no indication that, at the time she lied, inspectors told her that the package had been addressed to "Jim."  Further, by her account, inspectors were accusing

---

[2] The subject package contained a bag of dog treats, in addition to heroin and methamphetamine.  Ms. Kriebel is the only witness that mentioned a dog's presence on the date in question.

her of having the drugs mailed to her home. Thus, she would have no logical reason to try to conceal Defendant's identity at that time.

Moreover, by Ms. Kriebel's own admission, she lied several more times. According to her testimony, inspectors told her that they needed to speak with "Chris". She acquiesced and they went into the house. She did not correct her lie at that time. As they walked into and through the house, Ms. Kriebel testified that she called for "Chris" to get up. She did this knowing full well that it was the Defendant she was trying to awaken. There is no evidence or indication that Ms. Kriebel ever corrected her lie with inspectors. Rather, it was Defendant who correctly informed them of his name.

By contrast, the postal inspectors' testimony, particularly the testimony of Weckerly and Holestine, was consistent, both with each other and with the version of events their testimony portrayed. The defense did highlight one apparent inconsistency in that postal inspectors claimed that they wanted to be extra-cautious about conducting Defendant's interview on the date in question but failed to obtain a written *Miranda* waiver at the time of his interview. This inconsistency is problematic, but it is not fatal to their credibility assessment because they provided a reasonable explanation: they forgot to put the forms in the vehicle. While not favorable to the Government's position, the undersigned notes that there is no evidence which would indicate that this omission was the result of something more sinister or nefarious than a simple mistake.

Accordingly, and for all of the foregoing reasons, the undersigned relied upon the testimony of Inspectors Weckerly and Holestine in assessing the issues raised by Defendant. [3]

**B.**   ***Miranda* – Statements**

Defendant first argues that any statements made to inspectors on the date in question must be suppressed because he was in custody and he was not advised of his *Miranda* rights. For the reasons that follow, the undersigned does not find this argument persuasive.

---

[3] Though credible, Pierce did not recall much specific information about the events at issue.

24

*Miranda* warnings are required where police conduct a custodial interrogation of a suspect. *United States v. Hargrove*, 625 F.3d 170, 178 (2010). To determine whether a "custodial interrogation" is taking place despite the lack of formal arrest, the totality of the circumstances must be examined. *Id.* Specifically, the inquiry is whether, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Id.* (internal citations and quotations omitted). In other words, courts must ask "whether, when viewed objectively, a reasonable man in the suspect's position would have understood his situation to be one of custody." *Id.* (internal citations and quotations omitted). "In conducting this inquiry, it is important to remember that any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that a police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime....But only when there is a custodial interrogation is it necessary for the police to provide the suspect with *Miranda* warnings." *Id.* (internal citations and quotations omitted).

"[C]ustody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned, but depend instead on the objective circumstances of the interrogation. *Hargrove*, 625 F.3d at 181 (citing *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001)). Rather, the following factors are relevant to the issue of whether a person is in custody for purposes of *Miranda*: (1) the time, place, and purpose of the interaction; (2) the officer's words; (3) the officer's tone of voice and general demeanor during the interaction; (4) the number of officers present during the encounter; (5) the potential display of a weapon by an officer(s); and (6) whether there was any physical contact between officers and the subject of questioning. *United States v. Hashime*, 734 F.3d 278, 283 (4th Cir. 2013) (quoting *United States v. Day*, 591 F.3d 679 (4th Cir. 2010)). Also relevant are a suspect's isolation and separation from family members and physical restrictions. *Hashime*, 734 F.3d at 283.

After considering the evidence of these factors, the undersigned concludes that Defendant was not in custody at the time of the subject interview.

### 1.  Defendant was not in custody during his interview

Credible evidence indicates that Defendant was interviewed inside of his home.  The entire interview took place in his living room, on his couch.  The interview lasted for approximately one to one and one-half hours – not an overly considerable amount of time.  Only two of the three inspectors who were at Defendant's house that day participated in the interview, with only one inspector conducting primary communication.  Inspectors described Defendant as cooperative.  Inspectors did not raise their voices, and the atmosphere was calm.  While inspectors possessed their duty weapons that day, there is no evidence that they were drawn at any time.  None of the inspectors were wearing flak jackets or bullet-proof vests, which indicates that they did not anticipate a combative or violent interaction with Defendant.  To the contrary, credible evidence indicates that the exchange was <u>not</u> combative or otherwise fraught.

Moreover, Defendant was not physically restrained during his interview.  Defendant was not handcuffed.  Though Defendant and his Ms. Kriebel were separated while he was being interviewed, it appears that Ms. Kriebel was attending to other matters with Officer Knisely from the Brooke County Sheriff's Department, so their separation cannot be solely attributed to the inspectors.  Additionally, although Defendant does not appear to have moved about, the credible evidence indicates that he was able to do so if he chose.

### 2.  *Miranda* warnings were given

Even assuming, however, that Defendant was in fact in custody at the time of his interview with postal inspectors, his statements should nevertheless not be suppressed because credible evidence indicates that *Miranda* rights were provided to him and he made an intelligent and knowing waiver of the same.  According to Inspectors Weckerly and Holestine, Weckerly advised Defendant of his *Miranda* rights when he was seated on the living room couch and before they began asking Defendant questions.  Defendant indicated that he understood his rights and wished to speak with inspectors.  Inspectors did not obtain a written waiver of Defendant's rights under *Miranda*, and, of course, a written waiver would have been the better course of action.  However, failure to obtain a written waiver of a suspect's *Miranda* warnings is not

fatal to the issue because law enforcement is not required to obtain a written waiver of *Miranda* rights before questioning someone in custody. *Berghuis v. Thompkins*, 560 U.S. 370, 388-89 (2010).

**C.      Search**

Defendant next argues that the items seized as part of the search of Defendant's residence should be suppressed because it was a warrantless search and law enforcement did not have consent to conduct said search. For the reasons that follow, the undersigned is not persuaded by this argument.

"The Fourth Amendment protects against unreasonable searches and seizures." *United States v. Robertson*, 736 F.3d 677, 679 (4th Cir. 2013). "Searches without probable cause are presumptively unreasonable, but if an individual consents to a search, probable cause is unnecessary." *Id.* A subjective test is used to analyze whether consent is given, looking to the totality of the circumstances. *Id.* at 680 (citing *United States v. Wilson*, 895 F.2d 168. 171-72 (4th Cir. 1990). The burden of proving consent to search is on the Government. *Id.* at 680. Factors relevant to the determination of whether a person has consented to a search include the number of officers present; the time of the encounter; the characteristics of the person searched such as age and education. *Id.* Importantly, whether the individual searched was informed of his right to decline the search is a "highly relevant" factor. *Id.* (citing *Wilson*, 895 F.2d 172).

In the instant case, credible evidence indicates that Ms. Kriebel consented to the entry of her residence for purposes of conducting a search. Indeed, credible evidence indicates that, when Inspectors Holestine and Weckerly approached Ms. Kriebel, they asked her about the package they had in their possession. She disclaimed knowledge about the package. They asked if they could open the package. She gave her consent. Once they opened the package, they determined that heroin and methamphetamine were inside the parcel. They asked her whether she did drugs. She denied this, saying that she had done drugs about ten (10) years before, but that she was clean now. She offered to take a drug test and she offered to let inspectors search her house. Inspectors confirmed that they had permission to enter her house and search by asking her if they could enter and conduct a search. She gave consent.

Credible evidence further indicates that Defendant made a knowing and intelligent waiver of his right to refuse a search of both his cell phone and the residence. Testimony of Inspectors Weckerly and Holestine indicate that they advised Defendant of his rights with respect to a search of his cell phone and of his residence. They reviewed the consent-to-search form with him, which Defendant signed and initialed. Credible evidence also indicates that they obtained consent to search the residence for a firearm which was located in the bedroom, and which consent is also evidenced by Defendant's signature and initials on the consent-to-search form.

In making the aforementioned findings, the undersigned would note that only two (2) to three (3) postal inspectors were present when Defendant's consent was sought and obtained. Credible evidence further indicates that these postal inspectors were in and out of the house during this time, rather than looming over Defendant in an attempt to intimidate him or force him to sign the consent-to-search form. At the time his consent to search was given, Defendant was a fifty-four (54) year old man with some college education. Such evidence suggests that Defendant should have had no problems understanding his rights and his ability to waive them and his ability to revoke consent.[4] For these and all of the foregoing reasons, the undersigned would conclude that Defendant knowingly and voluntarily consented to the subject search.

## V.
## CONCLUSION

Based on the foregoing, the undersigned would conclude that Defendant has failed to establish a basis upon which to suppress the statements and evidence that are the subject of his Motions. Further, the Government has demonstrated by a preponderance of the evidence that it had Defendant's consent to elicit his statements, and that it had consent to search the subject residence. Accordingly, and for all of the

---

[4] Although Defendant testified that he did not understand the consent-to-search form, his testimony did not indicate that his inability to understand the form was because of his education or lack thereof. Rather, his inability to understand related to his inability to read the document without his glasses and his claim that no one read or explained the form to him. For the reasons set forth above, the undersigned did not find this testimony to be credible.

28

foregoing reasons, the undersigned **RECOMMENDS** that the Defendant's Motions to Suppress Evidence [ECF Nos. 19 and 20] be **DENIED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within **fourteen (14) days** after being served with a copy of this Report and Recommendation file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to parties who appear pro se and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia, to the United States Marshals Service and to the United States Probation Office.

Dated:  11/8/2019

JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE

29